727 A.2d 61 (1999)
320 N.J. Super. 263
Joseph DeANGELIS, Plaintiff-Appellant,
v.
Arthur ROSE, Esq., an attorney at Law of the State of New Jersey and Rose & DeFuccio, Attorneys at Law of the State of New Jersey, Lorraine Breitman, Esq., Attorney at Law of the State of New Jersey. Defendants-Respondents, and
Michael J. Sprague, Esq., an Attorney at Law of the State of New Jersey as Secretary of the Supreme Court of New Jersey District Fee Arbitration Committee for Bergen County, District II-B, South Bergen and Stephen H. Roth, Esq., an Attorney at Law of the State of New Jersey, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued February 10, 1999.
Decided April 9, 1999.
*62 Hilton L. Stein, Towaco, for plaintiff-appellant (Diane M. Acciavatti, on the brief).
Meredith Kaplan Stoma, Livingston, for defendants-respondents (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys; Richard E. Arvidson, of counsel; Ms. Stoma, on the brief).
Before Judges KING, WALLACE and NEWMAN.
The opinion of the court was delivered by KING, P.J.A.D.
I
Plaintiff, Joseph DeAngelis, brought this action for damages against attorneys who represented his daughter, Denise Tarulli, in matrimonial dissolution litigation. Plaintiff executed a written guarantee of the fees to be charged his daughter by defendant attorneys, Arthur Rose, Lorraine Breitman, and Rose & DeFuccio. The principal thrust of plaintiff's action is for malpractice. We conclude *63 that plaintiff's status as guarantor of his daughter's legal fees in her matrimonial dissolution does not confer upon him the right to sue her attorneys for legal malpractice, particularly where the daughter client makes no claim of malpractice herself. We affirm the summary judgment in defendants' favor on the malpractice claims, counts one through four. We also affirm with respect to the dismissal of the claims for breach of contract, counts five and six.
II
In February 1990 plaintiff and his daughter, Denise Tarulli, went to the Arthur Rose law firm to retain defendant Rose in the daughter's matrimonial proceedings involving her former husband, Thomas V. Tarulli. Arthur Rose and Denise Tarulli entered into a written representation and retainer agreement. The agreement described the nature of the representation and the fee schedule. No maximum on the total fee was set. The agreement did not represent that Arthur Rose would principally or exclusively handle Denise Tarulli's matter. Plaintiff guaranteed the fees for the retainer arrangement in writing.
Plaintiff alleges that at the time he guaranteed payment of legal fees defendant Rose informed him and his daughter that Rose would personally "handle" the case from start to finish. However, according to plaintiff, defendant Lorraine Breitman, an attorney associated with the law firm of Rose & DeFuccio, had "virtual exclusive responsibility" with regard to the representation of Denise Tarulli throughout the matrimonial proceedings. Plaintiff also alleged that defendant Rose gave a "ball-park" figure that legal fees would not exceed $30,000. Eventually, as the acrimonious and drawn-out proceeding unfolded, the estimated $30,000 escalated to about $70,000 in fees for the Rose firm. Denise Tarulli filed for bankruptcy in November 1991 and was discharged in March 1992.
On February 14, 1994 plaintiff filed this action against Rose, Rose's firm, and Lorraine Breitman. The complaint alleged that the Rose defendants committed legal malpractice during their representation of plaintiff's daughter throughout her matrimonial proceedings. Specifically, plaintiff alleged that the Rose defendants (1) breached a general duty of care to plaintiff (count one); (2) breached a duty owed to plaintiff by committing legal malpractice (count two); (3) were professionally negligent and as a result breached a fiduciary relationship with the plaintiff (count three); (4) committed intentional and negligent misrepresentation (count four); (5) breached a contract with plaintiff (count five), and (6) breached both implied and express warranties and the implied covenant of good faith and fair dealing (count six). Counts seven and eight for consumer fraud and injunctive relief were dismissed and are not involved in this appeal.
The complaint described the general nature of the damages for which plaintiff sought recovery this way:
23. Plaintiff has paid for his daughter and grandchildren's food, medical bills, psychologists, housing, legal fees, costs and expenses all the while seeking unsuccessfully to persuade Lorraine Breitman to pursue the case in a much more aggressive fashion. While Denise Tarulli had her car repossessed, had no health insurance benefits for her or her children, suffered severe emotional upset during what was the most traumatic time of her life, Defendant Rose sought to line his own pockets with demand after demand for more legal fees and costs.
24. The Plaintiff was forced to watch his daughter and grandchildren become almost destitute before his very eyes. The Plaintiff and his family lost their dignity and became so embroiled in the proceedings that the DeAngelis family structure virtually collapsed.
25. As a direct and proximate result of these events, Plaintiff's health deteriorated. He suffered high blood pressure and other related illnesses solely as a result of Defendant Rose's conduct. In fact the Plaintiff gained 40 pounds and was near having a stroke from the emotional distress which he suffered as a direct and proximate result of the conduct of the Defendants.

*64 26. Defendants took advantage of Plaintiff at his most vulnerable time, namely, when the welfare of his daughter and grandchildren was at stake. Further, the Defendants conducted themselves in such an unconscionable way as to result in permanent financial and emotional loss for Plaintiff.
27. Defendants failed to render the Plaintiff and Denise Tarulli adequate advice as to the possibility of problems associated with the enforcement of support orders entered against Denise Tarulli's former husband. The Defendants further failed to advise Denise Tarulli and the Plaintiff of the possibility of a bankruptcy filing by her former husband. The Defendants further deprived the Plaintiff Joseph DeAngelis and Denise Tarulli of their ability to make informed decisions with respect to the management of the divorce litigation, particularly on decisions whether or not to settle or proceed or other [sic] how to accurately protect the rights of Denise Tarulli and her children.
* * * * *
31. Plaintiff has suffered from physical and psychological ailments which have resulted in substantial bodily injury and severe demonstrative psychiatric sequelae relating to the conduct of the Defendants.
The Rose defendants moved for summary judgment in January 1995. At oral argument, Judge Farren stated that there was privity between defendant Rose and Denise Tarulli, plaintiff's daughter, but not between plaintiff and defendant Rose because plaintiff was only a guarantor of legal fees. Plaintiff's obligation under the retainer agreement was to pay if Denise Tarulli failed to do so.
Regarding the legal malpractice claim, Judge Farren stated that three things must be established: (1) an attorney-client relationship; (2) a breach of the duty owed to the client; and (3) proximate cause with regard to the breach. Judge Farren found that there was no attorney-client relationship between plaintiff DeAngelis and defendant Rose.
Judge Farren said there is an additional way in which a duty between the parties may be established and cited to Stewart v. Sbarro, 142 N.J.Super. 581, 593, 362 A.2d 581 (App.Div.), certif. denied, 72 N.J. 459, 371 A.2d 63 (1976), and stated:
. . . [T]he Appellate Division stated as follows: "It is true that generally an attorney is not liable to third persons for negligence in the performance of his professional duties." But this rule is not all encompassing.
"Thus, where an attorney assumes a fiduciary obligation it applies to persons who, though not strictly clients, he has or should have reason to believe, rely on him. We believe, moreover, that whereas here
an attorney undertakes a duty to one other than his client, he may be liable for damage caused by a breach of the duty to a person intended to be benefitted by his performance."
The judge stated that all of the cases he read with regard to this fiduciary duty dealt with individuals who were personally relying upon the work of the attorney. Regarding the present case, the judge stated, "I cannot [conclude] that there was a fiduciary duty between Rose and Mr. DeAngelis." In reaching this decision, the judge stated that to determine whether or not a fiduciary duty existed the court must analyze the extent the transaction affects the plaintiff, the foreseeability of reliance and harm to the plaintiff, the degree of certainty plaintiff suffered injury, and, from a public policy standpoint, the need to prevent future harm without burdening the profession.
Regarding the effect on plaintiff, the judge found that other than "an emotional overlay," the transaction did not substantially impact the plaintiff. The judge noted that the transaction itself, the retainer agreement, and the representation of plaintiff's daughter, "really had no effect on the plaintiff other than the emotional aspect of it that all parents ... have when their children are getting divorced."
Regarding foreseeability of reliance and harm to plaintiff, the judge observed that "I don't know what reliance that Mr. Rose would have to have foreseen other than that Mr. Rose was going to do a good job for Ms. *65 Tarulli." Regarding injury suffered by plaintiff, Judge Farren noted plaintiff's claim that he was distracted from his work because of the divorce of his daughter but stated that this was "always the case" and that matrimonial cases always have an emotional effect on the people involved.
In reference to the public policy of preventing future harm without burdening the profession, the judge stated that extending a duty in this case would put an extreme duty on the legal profession. The judge also stated:
The Court is of the opinion that you can't anticipate, in a divorce situation, that it may have an emotional effect on the parents and then be liable to the parents for this emotional effect. This is just taking it too far and really the attorneys couldn't properly represent their clients if that liability existed.
So, the Court finds that there was no fiduciary duty under the cases that would expose Mr. Rose to liability to Joseph DeAngelis.
Regarding plaintiff's claims for breach of warranty, the judge held that these claims are applicable to commercial transactions with the sale of goods but not to services by a professional. The judge said, "[t]here's nothing guaranteed in the legal profession, especially so in the matrimonial field." The judge observed that courts have addressed and denied the issue of breach of warranty claims against the medical and dental profession; he found that the legal profession falls in the same category and such claims were precluded.
Regarding plaintiff's claims that defendant Rose himself would handle the case from start to finish and the fee would not exceed about $30,000, the judge stated this was basically a contract claim. He found plaintiff's claim for breach of contract (count five) and breach of the implied covenant of good faith and fair dealing (count six) were "still open" and withstood the motion for summary judgment. Judge Farren entered an order dismissing the first, second, third, fourth, seventh (consumer fraud), and eighth (injunctive relief) counts of the plaintiff's complaint. No appeal is taken from the dismissal of the seventh and eighth counts.
In October 1996, following a discovery period, the Rose defendants made another motion for summary judgment on the fifth and sixth counts of plaintiff's original complaint. In December 1996 plaintiff filed a cross-motion to vacate the order entered by Judge Farren in May 1995 dismissing the first, second, third, fourth, seventh, and eighth counts of plaintiff's original complaint. Judge Locascio heard these motions.
Regarding plaintiff's motion to vacate the May 1995 order, Judge Locascio denied this motion pursuant to R. 4:49-2 finding it was "way out of time." He stated a motion for rehearing or reconsideration seeking to alter or amend a judgment shall be served no later than ten days after service of the judgment or order upon all parties by the party obtaining it. Judge Locascio said it was clear from the rule that the ten-day time period ran from the signing of Judge Farren's order, not the final adjudication of the case. Judge Locascio recognized plaintiff's contention that Judge Farren had erred according to Petrillo v. Bachenberg, 139 N.J. 472, 655 A.2d 1354 (1995), decided March 29, 1995, one month after the hearing on the motion for summary judgment but prior to the signing of Judge Farren's order on May 19, 1995. Despite this contention, Judge Locascio stated plaintiff should have made a motion for reconsideration pursuant to R. 4:49-2 before Judge Farren signed the order. But see Johnson v. Cyklop Strapping Corp., 220 N.J.Super. 250, 263-64, 531 A.2d 1078 (App.Div.1987) (R. 4:49-2 and R. 4:50-1 time-bars do not apply to interlocutory orders).
After denying plaintiff's motion to vacate Judge Farren's May 1995 order, Judge Locascio stated the issues which needed resolution were plaintiff's claims that (1) there was a $30,000 limit on legal fees based on the retainer agreement and (2) defendant Rose would exclusively handle the case. Additionally, Judge Locascio asserted he would decide the Rose defendants' motion for summary judgment on the counterclaim as to a balance due of $26,617 plus interest.
Judge Locascio set forth the standards for summary judgment from Brill v. Guardian *66 Life Ins. Co., 142 N.J. 520, 666 A.2d 146 (1995). As to plaintiff's exclusive representation claim, the judge found that plaintiff and the client agreed to Breitman's substantial participation. In this finding, Judge Locascio concluded the record before him demonstrated that defendant Breitman represented plaintiff's daughter and "nobody complained." Additionally, there was a Christmas card or some other letter from plaintiff's daughter thanking defendant Breitman for "doing a great job." The judge made these specific findings:
With respect to the other theory about Rose not representing her individually, there can be no question that he [plaintiff] agreed to that. And I know exactly why, the evidence is clear as to why, because Lorraine Breitman was doing a fine job.
* * * * *
THE COURT: [Denise] Tarulli, she was happy. It's evident, it's clear from the record from papers submitted. I don't have anything from her saying that Breitman wasn't doing a good job. She was satisfied. And that's a common experience in the practice of law.
Now, although I'm a judge, I'm also still a lawyer, and I don't divorce myself from the practical things that happen in the practice of law. People come in every day. I want this lawyer. And fine, that lawyer says, I'll represent you. And then associates do the work. And a relationship is often developed with the associate and the client. And all of a sudden, the client likes the associate.
That's exactly what happened here. There's no question about it. And no jury could find otherwise, that [Denise] Tarulli, the client, was happy with Breitman. And clearly, the father, Mr. DeAngelis, had to know that his daughter was happy with the representation by someone other than Mr. Rose. And therefore, I am granting summary judgment with respect to that theory of law, because no jury, let me use the words of the Supreme Court in Brill, "No Jury could resolve this disputed issue in favor of the plaintiff." Namely, the question of whether or not Rose was to continue to represent the plaintiff only.
They couldn't find that. Breitman handled the case. It probably started out on the non-crucial matters, developed a relationship with the client, the client liked Breitman, Breitman liked the client. Things went well until the final result. Then, as a post-representation disgruntled feeling, the plaintiff says, well, Rose was supposed to represent me.
I don't buy it. I don't think any jury could properly find that. I think there was an agreement, and that was clearly voluntary by [Denise] Tarulli and by Mr. DeAngelis to continue to let Ms. Breitman represent Tarulli during the course of the representation. Therefore, I'm going to grant summary judgment on that theory to the defendant.
Judge Locascio found it clear that plaintiff's daughter was satisfied with defendant Breitman as her attorney and that there was nothing in the record which indicated defendant Breitman was not "doing a good job." The judge granted the Rose defendants' motion for summary judgment on the issue of whether defendant Rose was required to exclusively represent plaintiff's daughter and dismissed plaintiff DeAngelis' claim on this issue.
Further, Judge Locascio denied the Rose defendants' summary judgment motion with respect to the alleged "cap" on legal fees of $30,000. He also denied summary judgment on the Rose defendants' counterclaim for the balance of the fees due, $26,617.80 plus interest. In the January 10, 1997 order, Judge Locascio noted that at this juncture the only remaining issues were the alleged representation by the Rose defendants that legal fees for the underlying matrimonial suit would not exceed $30,000 and the Rose defendants' counterclaim.
On June 16, 1997, the scheduled trial date, plaintiff DeAngelis and the Rose defendants entered into a settlement agreement to dispose of the remaining contract claims under counts five and six. This was placed on the record before Judge Locascio on June 16, 1997. Pursuant to the terms of the settlement agreement, plaintiff consented to judgment *67 in favor of the Rose defendants in the amount of $20,000 on the counterclaim asserted by the Rose defendants. The plaintiff and the Rose defendants agreed that this consent judgment would be held in escrow pending plaintiff's appeal to the Appellate Division on the dismissal of the malpractice counts, one through four. The settlement agreement provided that should the Rose defendants ultimately prevail in the appellate process, plaintiff would have thirty days to satisfy the judgment of $20,000, or it would be recorded. If the plaintiff prevailed on the appeal and the matter was remanded for trial, the $20,000 judgment on the counterclaim would be vacated, and the entire matter would proceed.
On October 3, 1997 a consent order was entered by Judge Locascio dismissing these remaining counts of plaintiff's complaint for breach of contract and breach of the implied covenant of good faith and fair dealing (counts five and six). Plaintiff then filed a notice of appeal with this court on November 17, 1997.
III
This case squarely presents the issue of a guarantor's right, without joinder by the client, to bring an action for legal malpractice. Here the malpractice action is by a parent paying the attorney's fee. This is probably not an unusual undertaking in these timesa parent or "significant other" person guaranteeing an attorney's fee in matrimonial litigation. Neither our research nor counsel's efforts have unearthed precedent for this type of derivative action. The duty of an attorney to a person other than a client historically has been a prickly subject, approached cautiously by courts.
The requisite elements of a claim for legal malpractice are: (1) the existence of an attorney-client relationship creating a duty of care upon the attorney; (2) the breach of such duty; and (3) proximate causation. Albright v. Burns, 206 N.J.Super. 625, 632, 503 A.2d 386 (App.Div.1986). The absence of an attorney-client or fiduciary relationship is not necessarily always a basis to deny a legal malpractice claim asserted against an attorney by a non-client. Atlantic Paradise v. Perskie, Nehmad, 284 N.J.Super. 678, 685, 666 A.2d 211 (App.Div.1995), certif. denied, 143 N.J. 518, 673 A.2d 276 (1996).
The determination of any duty is a question of law for the court. Petrillo v. Bachenberg, 139 N.J. 472, 479, 655 A.2d 1354 (1995); Wang v. Allstate Ins. Co., 125 N.J. 2, 15, 592 A.2d 527 (1991)("The question of whether a duty exists is a matter of law properly decided by the court, not the jury, and is largely a matter of fairness or policy."). See also Taylor v. Cutler, 157 N.J. 525, 724 A.2d 793 (1999), affirming o.b., 306 N.J.Super. 37, 41-42, 703 A.2d 294 (App.Div. 1997).
The Restatement of the Law Governing Lawyers § 73 (Tentative Draft No. 8, 1997), entitled "Duty of Care to Certain Non-Clients" provides:
For purposes of liability ..., a lawyer owes a duty to use care . . . :
(2) to a non-client when and to the extent that:
(a) the lawyer or (with the lawyer's acquiescence) the lawyer's client invites the non-client to rely on the lawyer's opinion or provision of other legal services, and the non-client so relies, and
(b) the non-client is not, under applicable tort law, too remote from the lawyer to be entitled to protection[.]
The Restatement also explains the rationale of the attorney's duty to a non-client and the limitations on that duty, stating:
Lawyers regularly act in disputes and transactions involving non-clients who will foreseeably be harmed by inappropriate acts of the lawyers. Holding lawyers liable for such harm is sometimes warranted.
* * * * *
Making lawyers liable to non-clients, moreover, could tend to discourage lawyers from vigorous representation. Hence, a duty of care to non-clients arises only in the limited circumstances described in the Section and must be applied in light of those conflicting concerns.

*68 [Restatement of the Law Governing Lawyers, § 73 comment b, (Tentative Draft No. 8, 1997).]
The Restatement's Tentative Draft explains the types of situations where an attorney owes a duty to non-clients as a result of the attorney inviting reliance of non-clients, stating that:
The lawyer's client typically benefits from the non-client's reliance, for example, when providing the opinion was required by contractual obligation of the client, and recognition of such a claim does not conflict with duties the lawyer properly owed to the client.
* * * * *
Clients or lawyers may invite non-clients to rely on a lawyer's legal opinion or services in various circumstances.... For example, a sales contract may provide that the seller's lawyer will provide the buyer with an opinion letter stating that, upon investigation, the lawyer found no security interests encumbering the property being sold.... Often, a non-client will require such an opinion letter as a condition for transacting with a lawyer's client. A lawyer's opinion may state the results of a lawyer's investigation and analysis of facts as well as the lawyer's legal conclusions....
* * * * *
In some circumstances, reliance by many unspecified persons may be invited, as when a lawyer for a borrower writes an opinion letter to the original lender in a bank-credit transaction knowing that the letter will be used to solicit other lenders to become participants in syndication of the loan.

[Restatement of the Law Governing Lawyers § 73 comment e, (Tentative Draft No. 8, 1997).]
Our leading authority on the subject is Petrillo v. Bachenberg, 139 N.J. at 472, 655 A.2d 1354. The issue in that case was whether the attorney for the seller of real estate owed a duty to a potential buyer. The plaintiff alleged that because of the attorney's negligence, plaintiff received a "misleading" copy of a percolation-test report which induced her to sign a contract to purchase the property. Id. at 474, 655 A.2d 1354. The Supreme Court stated that whether an attorney owes a duty to a non-client third party depends on balancing the attorney's duty to represent clients vigorously with the duty not to provide misleading information on which third parties forseeably will rely. Id. at 479, 655 A.2d 1354. The Court held that
[A]ttorneys may owe a duty of care to non-clients when the attorneys know, or should know, that non-clients will rely on the attorney's representations and the non-clients are not too remote from the attorneys to be entitled to protection.
[Id. at 483-84, 655 A.2d 1354.]
The Court observed that the primary concern is to "cabin" the duty of the lawyer so the resulting obligation is fair to both lawyers and the public. Id. at 484, 655 A.2d 1354. The Court summarized the duty owed, stating that "... a lawyer's duty may run to third parties who forseeably rely on the lawyer's opinion or other legal services." Id. at 485, 655 A.2d 1354.
The Court further determined that when the defendant attorney had extracted information from existing percolation-test reports, created a composite report, and delivered the report to a real estate broker, he should have known that the broker might deliver the report to a buyer who may reasonably rely on the information. Id. at 486, 655 A.2d 1354. On the facts presented in Petrillo, the Court held the defendant attorney assumed a duty to the plaintiff prospective-purchaser to provide reliable information regarding the percolation tests and that the attorney should have foreseen that a prospective purchaser would rely on the percolation-test report in deciding whether to sign the contract for sale of the property and proceed with engineering and site work. Id. at 487, 655 A.2d 1354.
Similarly, in Atlantic Paradise v. Perskie, Nehmad, 284 N.J.Super. at 683, 666 A.2d 211, plaintiffs claimed the defendant attorney who prepared an amended public offering statement misrepresented that residential *69 unit owners of a planned high-rise condominium building would have the unrestricted right to lease or rent their units and that plaintiffs had relied on this public offering statement to their detriment. Based on these facts, Judge Kleiner held that reliance by purchasers on the content of the public offering statement was foreseeable. Id. at 685, 666 A.2d 211. He also held that the defendant attorney had a duty to plaintiffs as a matter of law. Id. at 686, 666 A.2d 211.
In the present case, plaintiff and his daughter Denise Tarulli originally went to the Rose firm to retain defendant Rose to represent her in matrimonial litigation with her former husband, Thomas V. Tarulli. Defendant Rose and Denise Tarulli entered into an attorney-client agreement which described the representation and the schedule of fees. Defendant Rose required plaintiff to guarantee, in writing, payment of the fees. Plaintiff guaranteed payment of Rose's attorney's fees. However, there was no attorney-client relationship established between plaintiff and the Rose firm. Plaintiff was only a guarantor.
As demonstrated by Petrillo and Atlantic Paradise, an attorney may owe a duty to a non-client in certain circumstances. Here, unlike the situations in Petrillo and Atlantic Paradise, there was no written opinion letter, report, offering statement, specific undertaking or the like relied upon by plaintiff. See also R.J. Longo Construction Co. v. Schragger, 218 N.J.Super. 206, 527 A.2d 480 (App.Div.1987) (third party beneficiary theory in favor of contractor for town); Albright v. Burns, 206 N.J.Super. at 625, 503 A.2d 386 (attorney knowingly facilitated improper transactions); Stewart v. Sbarro, 142 N.J.Super. at 581, 362 A.2d 581 (attorney failed to obtain execution of security agreements).
As a guarantor of legal fees only and as father of the client, we find plaintiff is sufficiently remote from the ambit of Rose's professional services to bar this claim. Our research to date reveals no case which has extended an attorney's professional duty to the non-client guarantor of legal fees. This includes the numerous cases mentioned in the Restatement of the Law Governing Lawyers § 73 (Tentative Draft No. 8, 1997). See also Jay M. Feinman, Economic Negligence: Liability of Professionals and Businesses to Third Parties for Economic Loss, § 9.1 to 9.5.5 at 275-342 (1995).
We are particularly concerned about extending the duty of an attorney for malpractice liability in the increasingly volatile field of matrimonial litigation. Extension of the malpractice duty to financial guarantors, whether parents or significant others, is fraught with potential for conflicts of interests, undermining confidential relationships, and disputes over control and strategy in litigation. Even describing the scope and nature of an attorney's secondary professional duty to a financial guarantor is virtually an impossible task. Circumscribing the nature of the potential damage claims is also daunting.
From all appearances in this record, plaintiff's disappointment in the progress and ultimate result in his daughter's torturous matrimonial proceedings stemmed in large part from the intractability and obstinacy of her former husband, an indigenous characteristic of these matters, often beyond the control of any level of professional skill or zeal. We reject plaintiff's invitation to create a new cause of action in this circumstance, especially where the client herself does not complain.
Also of moment, the commercial relationship of plaintiff and the Rose firm is one of guarantor and creditor. Plaintiff himself was not a party to the hiring contract. Denise Tarulli "accepted and agreed" to the terms; plaintiff simply "guaranteed" payment. Under our law, there is no special relationship created between a guarantor and the creditor. Pepe v. GMAC, 254 N.J.Super. 662, 666, 604 A.2d 194 (App.Div.), certif. denied, 130 N.J. 11, 611 A.2d 650 (1992) (citing as examples Mid-State Fertilizer Co. v. Exchange Nat'l Bank, 877 F.2d 1333, 1336 (7th Cir.1989); Sherman v. British Leyland Motors, Ltd., 601 F.2d 429, 439-40 (9th Cir.1979); Wells Fargo Ag Credit Corp. v. Batterman, 229 Neb. 15, 424 N.W.2d 870, 874 (1988)). In Pepe, the plaintiffs were guarantors of debts of corporations which they owned and operated. Virginia and Richard Pepe sued GMAC to recover damages for *70 "the demise of the Pepe empire" of automobile dealerships. The corporation which ran the dealerships was in bankruptcy. The corporations had developed a relationship with GMAC for floor-plan financing. The complaint alleged GMAC altered its practices and made it very difficult to conduct business, causing financial problems to the car dealership. The Pepes alleged GMAC destroyed their business. The cause of action pled breach of covenant of good faith and fair dealing, fraud, misrepresentation, and other acts of negligence. The Law Division dismissed the action finding that the Pepes could not proceed as individuals. We affirmed.
We were not persuaded by the argument that the Pepes enjoyed a special relationship with GMAC because they had guaranteed the debts of the dealership or that they had extended mortgages and other collateral. This is the type of "special relationship" plaintiff seeks to create in the case before us. We conclude there was no such special relationship, especially where there was not even collateral pledged.
Pepe cited with approval Mid-State Fertilizer Co. v. Exchange Nat'l Bank, 877 F.2d 1333 (7th Cir.1989). There Judge Easterbrook described in detail the reasons that a guarantor does not have a "special relationship" with the creditor. That court opined:
Guarantors are contingent creditors. If the firm stiffs a creditor, that creditor can collect from the guarantor; the guarantor succeeds to the original creditor's claim against the firm. We know that creditors cannot recover directly for injury inflicted on a firm, so guarantors as potential creditors likewise cannot recover.
* * * * *
There is therefore no reason other than a semantic one to treat guarantors differently from debt investors in the firm, and semantics (even if glorified as semiotics or hermeneutics) is not good enough.
[Mid-State Fertilizer Co. v. Exchange Nat'l Bank, 877 F.2d at 1336.]
From a strictly commercial viewpoint, we see no good reason to extend the attorney's professional duty in this context.
IV
Plaintiff also appeals from the disposition of the fifth and sixth counts asserting claims for breach of contract and the implied covenants of good faith and fair dealing: (1) the alleged breach of the understanding of exclusive representation by Arthur Rose, and (2) the alleged breach of the "$30,000 cap" for Rose's services.
On the first point, we affirm for the reasons given by Judge Locascio in his January 10, 1997 oral opinion on the motion for summary judgment on this aspect. These reasons are stated at II above (opinion at 266-273, 727 A.2d at 63-67). We agree with the motion judge that any initial understanding of exclusive representation was clearly modified and condoned by the parties' conduct.
The ability to abandon or modify one's contract has been consistently recognized in New Jersey. County of Morris v. Fauver, 153 N.J. 80, 95, 707 A.2d 958 (1998). Further, "`[i]n the absence of some vested derivative interest in another, a contract may be modified, abrogated or rescinded by ... the contracting parties.'" Ibid, (quoting Gillette v. Cushion, 21 N.J.Super. 511, 516, 91 A.2d 421 (App.Div.1952)). Parties to an existing contract may, by mutual assent, modify that contract. Id. at 99, 707 A.2d 958 (citing Bohlinger v. Ward & Co., 34 N.J.Super. 583, 587, 113 A.2d 38 (App.Div.1955), aff'd, 20 N.J. 331, 120 A.2d 1 (1956)). Such modification can be proved by an explicit agreement to modify or by the actions and conduct of the parties as long as the intention to modify is mutual and clear. Ibid. Moreover, we have nothing in the record to suggest Breitman's representation was disapproved by anyone, certainly never the client, until the matter was almost concluded. Indeed the client has never voiced any disapproval.
On the final contractual aspect, the alleged $30,000 cap  this point was resolved by the described settlement on the day of trial and confirmed on the record *71 and by the "consent judgment" entered on October 3, 1997 dismissing the fifth and sixth counts. The conditional judgment, held in escrow pending the outcome of this appeal on the four malpractice counts and the exclusive representation breach-of-contract claim, was a settlement of the competing claims of plaintiff urging the "$30,000 cap" as applicable to his obligation and the Rose firm claim for an additional $26,617, plus considerable interest on its balance due. "A judgment or order entered with the consent of the parties is ordinarily not appealable for the purpose of challenging its substantive provisions." Pressler, Current N.J. Court Rules, comment 2 on R. 2:2-3 (1999); Winberry v. Salisbury, 5 N.J. 240, 255, 74 A.2d 406, cert. denied, 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950) ("This order was consented to by the attorneys for each party and it is therefore not appealable."); Infante v. Gottesman, 233 N.J.Super. 310, 318, 558 A.2d 1338 (App. Div.1989). Insofar as plaintiff attempts to appeal the October 3, 1997 order confirming the settlement reached on the day of trial, that appeal is dismissed.
Affirmed.